UNITED STATES of America, Plaintiff-Appellant, Cross-Appellee,

v.

Conway D. KITTREDGE, Defendant-Appellee, Cross-Appellant.

No. 29160.

United States Court of Appeals,
Fifth Circuit.

June 18, 1971.

Tuttle, Circuit Judge, filed opinion concurring in part and dissenting in part.

John L. Briggs, U. S. Atty., Jacksonville, Fla., Shiro Kashiwa, Asst. Atty. Gen., S. Billingsley Hill, Jacques B. Gelin, Edmund B. Clark, David W. Miller, Attys., Dept. of Justice, Washington, D. C., for the United States.

Charles E. Davis, William F. Simonet, of Fishback, Davis, Dominick, Simonet & Salfi, Orlando, Fla., for defendant-appellee.

Before JOHN R. BROWN, Chief Judge, and TUTTLE and GODBOLD, Circuit Judges.

GODBOLD, Circuit Judge:

In March, 1941, on the eve of World War II, the city of Orlando, Florida entered into a written agreement with the United States, executed on its behalf by the Corps of Engineers, relating to land and facilities for use by the Army Air Corps as a military airport. For $1.00 a year the city leased to the government lands adjacent to its airport and granted to the government "the full and unrestricted use by the Government concur-

rently and in common with the Lessor of the adjacent airport and facilities of the Lessor." The airport was to continue in use by commercial and private craft, along with the government's military use. Though changed and limited by many modifications so that it now covers only one small piece of property, this agreement remains in effect, extended to the year 1978.

In numerous amendments the parties have recognized that as to the leased land the government had the right to exclusive possession, but as to the common use land—the airport and its facilities, some 770 acres—the government was granted only a right to use it concurrently and in common with the city as fee simple owner.

The 1941 agreement gave to the government the right, with approval of the city, to erect structures on the land—sole use land and common use land—necessary to make the premises suitable for a military airport, such structures to remain the property of the government and to be maintained by it, with a right in it to remove them before expiration of the agreement.

In 1942 the government erected numerous structures on the lands, including, on the common use land, Bldg. T-980, approximately 20,000 sq. ft. in size. At a date not shown, but before 1950, the government ceased to use T-980 and put it on a "standby basis."

In 1949 the city entered into a grant agreement with the Civil Aeronautics Administration of the United States Department of Commerce for federal funds to improve the airport as a public facility. The CAA Administrator advised that the 1941 agreement was an encumbrance which created an undue risk of interference with operation of the airport as a public facility, and that the existence of it, under the terms of the grant agreement, prevented payment of the federal improvement funds. An amendment was executed under which the United States agreed not to exercise its rights under the lease so as to interfere with operation of the airport, and agreed that structures added by it should not be inconsistent with use of the airport as a public airport.

Shortly thereafter, in 1950, the government, through the Corps of Engineers, granted to the city a "license" to "use, operate and maintain" the lands covered by the 1941 agreement—sole use and common use land as well—plus other land in which the government had rights from other sources. The license was revocable at will and was stated to be "subject to" the 1941 agreement. Also it provided that exercise of the privileges granted was subject to the approval of the officer having immediate jurisdiction over the property, and that the licensee could not transfer, assign, sublet or grant to any other person any right or license in connection with the granted license without permission of such officer.

Still later in 1950, with the consent of the Corps of Engineers, the city sublet T-980 to a private manufacturing firm for a five-year term.

In April, 1956 the city leased to appellant Kittredge several acres of land, which included Bldg. T-980 and adjacent property, for a ten-year term with two five-year renewal options, for a fixed base aircraft service. Rent was on a gross receipts basis. T-980 was then in bad repair and not suitable for commercial purposes without improvements. The lease provided that it was subordinate to any existing or future agreement between the city and the United States relative to the property, and it forbade Kittredge to assign or sublet any of the premises and his rights and privileges without the consent of the city. After protracted negotiations between the city and the CAA as to the terms thereof, CAA gave its written approval to the city-Kittredge lease. In October, 1956, with the consent of the city and the CAA, Kittredge leased to the Glenn L. Martin Company two buildings: T-980 for 18 months with option to renew from year to year; for a seven-year period, a 22,000 sq. ft. Butler-type build-

ing to be erected by Kittredge on adjacent land held by him under his lease from the city. Kittredge constructed the Butler building and Martin occupied both structures.

Neither the city-Kittredge lease nor the Kittredge-Martin lease was submitted to or approved by the Corps of Engineers. In 1957 the Corps learned that Martin was in T–980 without its permission, and it twice invited the city to request after-the-fact permission for the subleasing to Martin and for alterations made to the building. More than two years of negotiations and discussions ensued. During this time a government auditing agency discovered that Martin was carrying on cost-plus projects for the government, and as a consequence, in 1959, the Corps took the position that the government was, in effect, paying rent on its own building by reimbursing Martin under a cost-plus arrangement for its rent paid to Kittredge.[1] Martin moved out of the building, the Corps took possession, and made an agreement directly with Martin, which then moved back in. Later the government and the city entered another supplemental agreement which deleted from the 1941 agreement all leased land and all common use land except the land on which T–980 was located (and about one-half acre of surrounding land, total 1.07 acres). The common use provision was deleted and in lieu the government was given this right: "To be used by the Government with full right of exclusive and unrestricted possession." The building was recognized to be the property of the government. The city released the government of any claims it might have under the 1941 agreement.[2] The effect of this agreement was that the 1941 arrangement was at an end except for T–980.

The District Court, after a nonjury trial, found that the city had no right to lease T–980 to Kittredge without the Corps' consent, which was never given, and that the CAA had no authority to consent on behalf of the government. It found that Kittredge had no possessory right in the building and could convey none to Martin. It concluded that Kittredge was a trespasser, liable in damages for the devaluation of the property. The court found that, when returned to the government, the building had been substantially improved and was of greater value than when taken over by Kittredge. It awarded nominal damages of one dollar. Kittredge's counterclaim was dismissed with prejudice because of the conclusion that he was a trespasser.

The government says first that the court used the wrong measure of damages for trespass, that it is entitled to all the rent that Kittredge received from Martin ($52,800),[3] less proper deductions, that Kittredge failed to prove proper deductions, therefore it should have judgment for $52,800. Second, it says that if we are unwilling to hold it entitled to $52,800, we should affirm the conclusion that Kittredge is a trespasser but remand for assessment of damages. And, third, the government contends that the trial court erred in focusing on common law trespass, that it should be given the complete relief in damages to which it is entitled for unauthorized use and occupancy of public lands, measured by a standard not clearly stated but apparently embracing equitable considerations.

We conclude that the trial court erred in entering judgment on the basis that Kittredge was a trespasser. The relation between the parties is an ambiguous one which must be more precisely

---

1. Kittredge claims there was inadequate proof of Martin's being reimbursed by the government. Because of our disposition of the case, we do not decide this question.

2. Under that agreement the government was forbidden to sublet "except to a desirable tenant and for a similar purpose."

3. We are not certain beyond doubt whether $52,800 is the gross rent received by Kittredge for T–980 alone, or for both buildings. There is an implication that Martin also received the use of parking and other open areas held by Kittredge as tenant of the city. These are questions that can be settled in the District Court.

determined on a remand before their relative rights can be adjudicated. Trespass is a possessory action, by one having possession or a right to possession. Until the status of the parties was established, any conclusion that the government had standing to sue for a claimed trespass, or that Kittredge was a trespasser, was premature.

It is possible that the court considered that the 1941 agreement made the government the tenant of all lands mentioned therein, and that the government as a tenant had standing to sue for a trespass to T–980. It is clear to us that, as to the common use land, there was not created a landlord-tenant relationship, which contemplates possession in the tenant exclusive against the world— even against the landlord—subject only to the landlord's right to enter to demand rent or to make repairs. Baille v. United States, 70 F.2d 527 (8th Cir. 1934); Bentley v. Palmer House, 332 F.2d 107 (7th Cir. 1964). The arrangement itself—for concurrent use of the Orlando airport for military and commercial purposes, granted in the same instrument and as an incident to the government's right to exclusive possession of adjacent land—makes it clear that as to common use land the government was something other than tenant.

It is possible that the agreement conferred a license, a right to use and occupy the land, creating in the government no interest or estate in the land, or an easement, which implies an interest in the land. *See* Burdine v. Sewell, 92 Fla. 375, 109 So. 648 (1926).[4]

The 1941 agreement is ambiguous as to the relative rights of the parties once

a building is erected on common use land. Under the agreement the building is the property of the government and may be removed by it prior to termination of the lease. The government is responsible for its maintenance. The city may require the government to "restore the premises"—whether this means "remove a structure" is not clear. We have no doubt that once the government erected T–980 on the common use land it had a right to exercise exclusive possession of the building itself and the underlying land, to the exclusion of the city.[5] We are not clear, and the findings of the District Court do not definitively establish, the relative rights of the parties once the government ceased to use T–980. It is possible that the sole right to use that building and the underlying land remained in the government. But it is also possible that the government could not tie up the underlying common use land until the end of the lease with an unoccupied building from which it could exclude the city.[6]

Kittredge contends that the city, as fee simple owner and common and concurrent user, was entitled to use of T–980 subject only to the limitation that it not exclude the government, and that this right, possessed at all times by the city, passed to him by his lease from the city, independently of government consent; that is, the 1950 license from the government did not impose governmental consent as a limitation upon rights of occupancy that the city already possessed. And, Kittredge contends, he has not excluded the government from any occupancy of which it sought to avail itself.

4. The agreement of 1950, prepared by the Department of the Army, by which the government conferred upon the city the right to use, operate and maintain various properties, including both sole use and common use land covered by the 1941 agreement and rights in land originating from other sources as well, was styled "License."

5. In like fashion, we are of the view that when the city leased to Kittredge land on which he built the separate Butler building for Martin, and Kittredge erected a building thereon, Kittredge (and Martin as his tenant) could occupy that building to the exclusion of the United States.

6. As noted just above, it is unclear whether the city could require removal of T–980 before the end of the lease.

Another possibility is that Kittredge is a constructive trustee holding funds paid to him by mutual mistake in what may be a comedy of errors with no invidious intent by any of those involved, with duty to account to the government for its appropriate portion thereof.[7] Indeed, this kind of accounting appears to be the relief which the government originally sought.

Since the trial court dismissed Kittredge's counterclaim with prejudice because of its conclusion that he was a trespasser, the dismissal must be reversed, and the counterclaim remanded for further consideration under the limitations of the Tucker Act, 28 U.S.C.A. § 1346, and the principles relating to the right of a defendant sued by the United States to maintain a claim which may partially defeat the claim of the government. *See e. g.*, Frederick v. United States, 386 F.2d 481 (5th Cir. 1967).

Reversed and remanded for further proceedings not inconsistent with this opinion.

TUTTLE, Circuit Judge (concurring in part and dissenting in part).

With deference I concur in the sending of this case back to the trial court, but must disagree as to the rejection of the trial court's determination that Kittredge was a trespasser and that the government had the sole possessory right at the time of the government's repossession of the building from Kittredge. I would remand the case to the trial court for its failure to grant substantial damages to the United States by way of mesne profits. Mesne profits should be measured under the Florida law as stated in Kester v. Bostwick, 153 Fla. 437, 15 So.2d 201, 206, where the court said: "The statute gives no yardstick by which to measure mesne profits in a case like this so we apply the general rule heretofore stated. That is to say, the value of the use and occupation during the period of wrongful possession which may be determined by the value of the net rents and profits. Net rents and profits has reference to a fair rental value less the cost of rental and collection, but does not contemplate interest on the investment."[1]

Feeling, as I do, that the government had a right of action for trespass, I must also disagree with the opinion of the court that the judgment of the trial court dismissing Kittredge's counterclaim was error.

I would reverse the judgment and remand the case to the trial court for the ascertainment of net mesne profits.

---

7. We can envision many factors that might bear on this: the cost of improvements made by Kittredge; fair return on the value of the improvements made by him; Kittredge's rental costs (including rental paid to the city); fair value of the use and occupancy of the building in the condition in which taken over by Kittredge; fair value of the use and occupancy of the underlying land. An additional factor is that there may be variations in the rights of the parties in land on which a structure has been erected (and the structure itself) and land on which no structure has been erected.

1. In civil actions brought under Title 28, Section 1345, U.S.C.A., federal courts do not apply state law, as they do in diversity cases. However, not being advised of any federal law in contradiction of the Florida rule, I would look to the Florida cases as offering as good a guide as any as to the common law on trespass and mesne profits, particularly since both parties would largely rely on Florida cases in their briefs.