UNITED STATES of America

v.

Marvin S. GILMAN et al.

Civ. No. 71–982.

United States District Court,
D. Maryland.

June 26, 1973.

George Beall, U. S. Atty., D.Md., Leonard M. Linton, Jr., Asst. U. S. Atty., Baltimore, Md., Roger C. Wesley, Atty., Dept. of Justice, Washington, D. C., for plaintiff.

M. Peter Moser, Monte Fried, John J. Kenny, Baltimore, Md., for defendants.

HERBERT F. MURRAY, District Judge.

This civil action is brought by the United States of America for the use, benefit and credit of the Secretary of Housing and Urban Development, acting by and through the Assistant Secretary-Commissioner under the provisions of the National Housing Act, as amended. [12 U.S.C. § 1701 et seq.]. Defendants, Messrs. Gilman, Rosen and Gozan, were investor-developers involved in the construction of a 16-story apartment building in the City of Baltimore, Maryland, known as Sutton Place. For various reasons, the financial posture of the Sutton Place Project, whose mortgage was insured by the Federal Housing Administration, deteriorated to such an extent that approximately four years after this redevelopment project obtained its initial financing, it fell into receivership and was sold at foreclosure. By this suit the United States contends that the Defendants through their ownership position in Sutton Place are liable for certain payments allegedly made out of the Project's funds in contravention of the provisions of the Federal Housing Administration Regulatory Agreement for Multi-Family Housing Projects [hereinafter Regulatory Agreement]. Because it is stipulated that the United States Government, through the Federal Housing Administration [now H.U.D.], contracted with the Defendants to insure the Sutton Place mortgage pursuant to 12 U.S.C. § 1715k, jurisdiction of this Court is properly invoked under 28 U.S. C. § 1345.

*Findings of Fact*

1. On October 23, 1961, the first step was taken in the development of Sutton Place when the Defendants, Marvin S. Gilman and Abraham A. Rosen, entered into a Joint Venture Agreement for the purpose of erecting a high-rise apartment building in the City of Baltimore, Maryland. On January 16, 1962, land was acquired for the planned project. Financing was obtained on March 16, 1962, when Gilman and Rosen, together with their wives, executed and delivered their Deed of Trust Note in favor of the Union Trust Company of Maryland, as beneficiary, in the sum of $5,952,200.00.[1] In order to secure repayment of this Deed of Trust Note, the Defendants, also executed and delivered, that same day, a Deed of Trust covering the Sutton Place property, to the Union Trust Company.

2. As further security, the Defendants Gilman and Rosen entered into a Regulatory Agreement with the Federal Housing Commissioner on March 16, 1962. By virtue of this agreement the loan obtained from the Union Trust Company in the sum of $5,952,200.00 was insured by the Federal Housing Administration pursuant to Section 220 of Title II of the National Housing Act, as amended [12 U.S.C. § 1715k] and the administrative regulations thereunder. Subsequently, the Union Trust Company assigned the Deed of Trust Note obtained from the Defendants, to the Metropolitan Life Insurance Company, who thereby became the owner of the Deed of Trust.

3. Late in 1963, the Project was in need of additional financing. To this end, a loan in the sum of $60,000.00 was obtained from Sterling Capital Corporation on November 12, 1963. It is undisputed that this loan was made payable to Sutton Place Management Corporation by a check dated November 15, 1963.

---

1. This Note provides for the payment of monthly installments of principal plus interest on the outstanding balance, at the rate of 5¼% per annum, up to and including the date of maturity, October 1, 2003.

The Government, through its witnesses, contends that the Sterling Capital Corporation loan was, in fact, a loan from Defendant Rosen, and not, as Defendants urge, a loan from Sterling to Sutton Place Management Corporation.[2] However, in the opinion of the Court, the testimony of David Uhlfelder, a Certified Public Accountant, employed by Sutton Place Management Corporation, resolves the question as to the true lender. This witness acknowledged that an initial accounting mistake had been made in attributing this loan to Mr. Rosen, but at a later date this error was detected and the entry changed to reflect the correct lender, Sterling Capital Corporation. Thus, the Court concludes that this loan of $60,000.00 was made to Sutton Place Management Corporation by Sterling Capital Corporation.

4. The Defendants, Gilman and Rosen, failed to make a principal payment which was due on December 1, 1963; prior to the due date of the next maturing installment on the Deed of Trust Note. After negotiation between Defendants Gilman and Rosen, and the noteholder, Metropolitan Life Insurance Company, an arrangement entitled a "Forebearance Agreement", was reached on February 28, 1964 with the written approval of the Federal Housing Commissioner, and with an effective date reaching back to October 1, 1963. In the meantime, on January 2, 1964, Defendant Rosen sold to the Defendant George Gozan, one-half of Rosen's 50% interest in the Project.

5. The Forebearance Agreement, which was signed only by Defendants Rosen and Gilman, provided, inter alia, that the Defendants pay to Metropolitan Life Insurance Company the net income of the Project to be applied to tax, hazard insurance and F.H.A. mortgage insurance, premium accrual accounts, and then to amounts due under the Deed of Trust and Deed of Trust Note and send monthly statements to Metropolitan Life Insurance Company. In return, Metropolitan Life Insurance Company promised in the Forebearance Agreement to defer any demand for payment of principal and interest, due under the Deed of Trust and Deed of Trust Note, to the extent that net income should not be sufficient to cover these items, until termination of the Forebearance Agreement on October 1, 1964. By a subsequent Forebearance Agreement dated October 28, 1964, the October 1, 1964 termination date was extended to October 1, 1965.

6. On December 19, 1964, Defendant Gilman transferred all of his right, title and interest in the Project to Defendant Rosen. Shortly thereafter, Gilman was given an option to repurchase a one-half interest in the Project. That option expired on December 31, 1970 without having been exercised by Defendant Gilman. On January 29, 1965, Defendant Rosen sold to Defendant Gozan one-half of the 50% interest Rosen acquired in his purchase from Gilman. Thus, after January 29, 1965, Defendants Rosen and Gozan each owned 50% of the Sutton Place Project. From the evidence, the Court finds that the F.H.A., through its agents, was aware that Defendant Gilman sold his interest in the Project to Defendant Rosen on December 19, 1964. The evidence further indicates that Defendant Gilman fully surrendered his financial and executive position with the Project on December 19, 1964. Thereafter, Gilman continued his relationship with the Project in an advisory capacity solely for the purpose of acquainting Defendant Gozan with the management duties that Gozan, as a new owner, would be assuming. However, from January, 1965, when Gozan took over ac-

2. Two corporations were established for purposes of erecting and operating the Sutton Place Project. Sutton Place Construction Corporation was the entity responsible for building of the Project, while Sutton Place Management Corpora-tion was concerned with such matters as the renting of apartments and upkeep of the completed Project. Each of the two corporations maintained separate corporate books and accounts.

tual management of the Project, at his own request, Defendant Gozan was not paid the $1,500.00 per month salary which his predecessor, Gilman, had received as compensation for services rendered to the Project.

7. On July 19, 1965, Defendants Rosen and Gozan, in their individual capacities, borrowed $125,000.00 from the Chemical Bank in New York City. This borrowed money was simultaneously deposited in an account at this bank which these Defendants had opened on July 15, 1965. Both sides agree that the $125,000.00 was subsequently credited to the account of Sutton Place Management Corporation in the Maryland National Bank on July 21, 1965 by means of a check dated July 19, 1965. However, the date of deposit—as distinguished from the date on which this money was *credited* by the bank to the Sutton Place account—is disputed. The Plaintiff maintains that the deposit in question did not occur until July 21, 1965, while Defendants urge that the deposit was made on July 20, 1965. The Court has examined the check and the relevant monthly account statements from the Maryland National Bank, together with the Government's audit work sheet and the testimony of trial witnesses. Based on this evidence, the Court finds that the $125,000.00 was deposited to the account of Sutton Place Management Corporation on July 20, 1965.

8. The parties are also at odds as to the true character of this $125,000.00 payment made to the account of Sutton Place Management Corporation. It is agreed that in making the $125,000.00 payment, Rosen and Gozan acted in their individual capacities and without any obligation on their part to provide additional funds. The Government argues that although the $125,000.00 was carried on the books of Sutton Place as a loan to the Project, there are no supporting documents to evidence that the $125,000.00 was, in truth, a loan to the Project from Rosen and Gozan. It is thus the Government's theory that the $125,000.00 constituted a cash advance to the Proj-

ect and was therefore not a loan, as is urged by the Defendants. Since the Court is without the benefit of direct documentary evidence, it is not an easy matter to find, as a matter of fact, that the $125,000.00 in question was either a loan or a cash advance to Sutton Place. Nevertheless, this Court has considered the pertinent secondary evidence, including documents and testimony of witnesses and finds, as a matter of fact, that on July 20, 1965, Defendants Rosen and Gozan made a loan to Sutton Place Management Corporation, in the amount of $125,000.00.

9. It is undisputed that in July, 1965 Sutton Place Management Corporation paid by check, $10,000.00 to Altman Brothers for construction work performed on the Project, and also by check paid $30,000.00 to Sterling Capital Corporation in partial repayment of the loan of November 12, 1963. At issue, however, is the exact date such payments were made, or more importantly, whether the checks were drawn before or after the July 20, 1965 deposit of $125,000.00 into Sutton Place Management Corporation's account. The Government argues that Sutton Place Management Corporation's payment to Sterling was made sometime between July 14, 1965 and July 20, 1965, and the $10,000.00 payment to Altman Brothers was made sometime between July 14, 1965 and July 19, 1965. The Defendants contend that although the Atlman Brothers' check bears the handwritten date of July 19, 1965, it was not signed and therefore not drawn by the Defendant Gozan until the next day, July 20, 1965. Similarly, Defendants urge that the Sterling Capital Corporation check which bears a July 20, 1965 date, was signed by Defendant Gozan on July 20, 1965. Upon consideration of the evidence, the Court finds that the $30,000.00 check to Sterling Capital Corporation was drawn on July 20, 1965 and the $10,000.00 check to Altman Brothers, though dated by its drawer, July 19, 1965, was actually drawn on July 20, 1965 subsequent to or simultaneously

with the $125,000.00 deposit to the account of Sutton Place Management Corporation. In so concluding, the Court also notes that the Sterling Capital Corporation check, drawn on July 20, 1965, was presented for payment and the Sutton Place Management Corporation's checking account charged on July 23, 1965. The Altman Brothers check, drawn on July 20, 1965 was presented for payment and the Sutton Place Management Corporation's checking account charged on July 27, 1965.

10. By two $15,000.00 checks dated October 25 and November 12, 1965, Sutton Place Management Corporation paid off the remaining $30,000.00 owed on the Sterling Capital Corporation loan. On April 11, 1966 and again on April 15, 1966, Defendants Rosen and Gozan each drew $4,000.00 from the Sutton Place Management Corporation account and thereby credited a total of $16,000.00 to their own personal accounts. These withdrawals were allegedly made as interest payments to Rosen and Gozan on the $125,000.00 loan which these Defendants made to Sutton Place Management Corporation on July 20, 1965. Also, on April 15, 1966, Defendant Rosen bought out Defendant Gozan's entire interest in Sutton Place Management Corporation, and alone, assumed all Project debts and expenses, including Gozan's obligation to pay one-half of the $125,000.00, which together, they had borrowed from the Chemical Bank.

11. On April 22, 1966, suit was filed by the United States to foreclose the mortgage on Sutton Place, which was then held by the Federal Housing Administrator. On this same date, a receiver was appointed and by August 11, 1966, the Sutton Place Project was sold at foreclosure to the United States Department of Housing and Urban Development. After the appointment of the receiver for Sutton Place, Defendant Rosen expended certain amounts of his personal funds in connection with the Project during the period April 22, 1966 to April 9, 1968.

## Conclusions of Law

The Court has found that Defendant Gilman was a part owner of Sutton Place from its inception until December 19, 1964. Prior to December 19, 1964 and in his ownership capacity, Mr. Gilman, together with Mr. Rosen, executed a Federal Housing Regulatory Agreement. However, both sides agree that at the time the payments were made which the Government claims were in violation of the Regulatory Agreement, Defendant Gilman had no proprietary interest in the Project. Therefore, as a threshold matter, the Court will determine whether Mr. Gilman, as the Plaintiff contends, is properly subject to liability in this action.

Defendant Gilman testified that he never sought a formal release from the Regulatory Agreement, nor did he ever obtain any written approval from the Commissioner for the transfer of his interest in the Project to Rosen on December 19, 1964. It is undisputed that paragraph 6 of the Regulatory Agreement requires Defendant Gilman to obtain written approval of the Commissioner prior to the transfer of his interest. Nevertheless, he contends that the Government is estopped from asserting his liability because the Government was fully aware of the sale of his interest to Rosen. To advance this contention, Gilman introduced evidence in the form of a newspaper article, an FHA audit report, and a letter from the Project's mortgagee to a local FHA Director. From this evidence, the Court has found that the Government was not ignorant of the transfer of Gilman's interest in Sutton Place. Defendant Gilman's argument invokes the doctrine of estoppel which is fully recognized under Maryland law. See, e. g., Phillips Roofing Co. v. Maryland Broadcasting Co., 184 Md. 187, 40 A.2d 298 (1944); McKeever v. Washington Heights Realty Corp., 183 Md. 216, 37 A.2d 305 (1944); Vincent v. Palmer, 179 Md. 365, 19 A.2d 183 (1941). Indeed, this doctrine may be applied in appropriate circumstances

against the United States. *See* Branch Banking & Trust v. United States, 98 F.Supp. 757, 120 Ct.Cl. 72, cert. denied, 342 U.S. 893, 72 S.Ct. 200, 96 L.Ed. 669 (1951). However, for two reasons this estoppel argument misses the mark.

▆▆▆ First, although the evidence indicates that certain FHA officials were aware of the sale of Gilman's interest in Sutton Place and perhaps even acted consistently with this understanding, nowhere does the evidence reveal any approval of Defendant Gilman's action. For Defendant Gilman successfully to defend on the estoppel ground, it would be necessary to show a present Governmental repudiation of a formal approval of Gilman's release. But, the Court is unable to translate Governmental awareness or activity, as adduced by the evidence, into the contractually prescribed "approval".[3] Secondly, Mr. Gilman testified that he knew that *only* the Commissioner's written approval could effect his release. His reliance on the understanding or actions of other Governmental officials was misplaced and cannot, in any event, properly raise an estoppel against the Plaintiff. *See* Savonis v. Burke, 241 Md. 316, 216 A.2d 521 (1966); Mayor and City Council of Baltimore v. Chesapeake Marine Railway Co., 233 Md. 559, 197 A.2d 821 (1964).

Defendant Gilman also argues that he was released by the Government from his obligations under the Regulatory Agreement. To incur any liability under the terms of the Regulatory Agreement, an individual must qualify as an "owner." *See* FHA Regulatory Agreement, paragraphs 6 and 12(d). At the same time, to divest oneself of ownership status by conveying one's ownership interest in a regulated project, the Regulatory Agreement requires that an owner obtain prior written approval of the Federal Housing Commissioner. FHA Regulatory Agreement, paragraph 6. As noted above, Defendant Gilman did not obtain any written approval as prescribed by the Regulatory Agreement at the time he sold his interest in the Project to Defendant Rosen. However, under Maryland law this failure does not foreclose Mr. Gilman from successfully demonstrating that his ownership position in Sutton Place terminated on December 19, 1964 and that the written approval required of the Regulatory Agreement was waived by the Government.

▆▆▆ Where a written contract provides that it can only be varied by a written agreement, the written agreement requirement can be waived by an express agreement of the parties or by *implication*. Taylor v. University National Bank, 263 Md. 59, 62–64, 282 A.2d 91, 93–94 (1971); Cole v. Wilbanks, 226 Md. 34, 38, 171 A.2d 711, 712–713 (1961); Freeman v. Stanbern Construction Co., 205 Md. 71, 78–82, 106 A.2d 50, 54 (1954). Whether the Government impliedly waived the written agreement requirement of the Regulatory Agreement can be "found from [the] circumstances and the conduct of the parties showing acquiescence or agreement." Cole v. Wilbanks, *supra,* 226 Md. at 38, 171 A.2d at 712. *See* Taylor v. University National Bank, *supra,* 263 Md. at 63, 282 A.2d 91. The Court has examined the Defendants' Exhibit No. 2, a letter of March 15, 1965 from Weaver Broth-

---

3. Under the Regulatory Agreement, the Commissioner is under no obligation to approve a request for a release. Consequently, even if the Commissioner received a formal request which put him on notice of the sale of a party's interest in a project, his refusal to respond to the request could not be equivalent to an approval.

"Owners shall not *without the prior written approval of the Commissioner:* (a) Convey, transfer, or encumber any of the mortgaged property, or permit the conveyance, transfer, or encumbrance of such property. . . ." F.H.A. Regulatory Agreement, paragraph 6 (emphasis supplied).

"Owners" is defined by paragraph 12 of the Regulatory Agreement as including the successors and assigns of the persons designated as owners in the agreement. F.H.A. Regulatory Agreement, paragraph 16.

ers, Inc. to Mr. C. H. Borcherding, Director of the Baltimore Office of the FHA, which clearly announces the sale of Mr. Gilman's entire interest in Sutton Place and Defendants' Exhibit No. 4, a return letter of August 17, 1965 by which Mr. Borcherding acknowledged the sale of Mr. Gilman's interest and asked that Mr. Gilman fill out certain forms. Mr. Gilman never filled out these forms, but the evidence also reveals that there were no further communications between Mr. Gilman and the FHA on this matter. Other uncontradicted evidence, strongly suggests that Mr. Gilman was treated by the FHA as having sold this entire interest in Sutton Place. From this, the Court can only conclude that the circumstances and conduct of the party effected an implied waiver of the Regulatory Agreement's requirement of prior written approval of a sale of Gilman's interest. Since it is undisputed that Gilman sold his entire interest in Sutton Place to Rosen on December 19, 1964, the Court finds that after that date Defendant Gilman was no longer an "owner" as that term is used in paragraph 6 of the Regulatory Agreement, and thus, does not stand liable for damages in this action.

Paragraph 6(e)(2) of the Regulatory Agreement provides that "no distribution shall be made from borrowed funds, prior to the completion of the Project or when there is any default under the Agreement or under the Note or Mortgage . . . ." Since it has been found that the $125,000.00 deposited in the Sutton Place Management Corporation account on July 20, 1965 was a loan from Defendants Rosen and Gozan, it must be determined whether any distribution, if made from this borrowed money, occurred during a time that there was any default under the Regulatory Agreement, Note, or Mortgage. It is agreed that the Defendants Gilman and Rosen failed to make a payment of principal on their mortgage which was due on December 1, 1963. However, by virtue of the Forebearance Agreement which applied retroactively to October 1, 1963, the Court finds that no default occurred under the terms of the Regulatory Agreement on December 1, 1963.[4] *See generally* Corbin on Contracts, § 1293; 17 Am.Jur.2d, Contracts §§ 470–71.

The Government claims that a total of $86,000.00 was distributed[5] from funds of the Project, without the approval of the Commissioner of Federal Housing, while there was no "surplus cash" and for other than reasonable operating expenses and/or necessary repairs. It is the Government's theory that the payments totaling $86,000.00 were made in violation of paragraph 6 of the Regulatory Agreement which provides that:

"Owners shall not without prior written approval of the Commissioner . . . (b) Assign, transfer, dispose of, or encumber any personal property of the project, including rents, or pay out any funds except from 'surplus cash, except for reasonable operating expenses and necessary repairs . . . (e) Make, or receive and retain, any distribution of assets or any income of any kind of the project except 'surplus cash' . . . ." For purposes of paragraph 6 of the Regu-

---

4. Paragraph 12(i) of the Regulatory Agreement specifies that: " 'Default' means a default declared by the Commissioner when a violation of this agreement is not corrected to his satisfaction within the time allowed by this Agreement or such further time as may be allowed by the Commissioner after written notice. . . ." Id. at paragraph 12(i).

Prior to 1966, there is no record of any default declared by the Commissioner as prescribed by this paragraph. Also, it is apparent that the Forebearance Agreement and the Forebearance Extension, signed with the authority of the Commissioner, come within the meaning of "such further time as may be allowed by the Commissioner."

5. " 'Distribution' means any withdrawal or taking of cash or other assets of the project other than for mortgage payments or for payment of reasonable expenses incident to its operation and maintenance. . . ." F.H.A. Regulatory Agreement, paragraph 12(h).

latory Agreement, "surplus cash means any cash remaining after: (1) the payment of: (i) All sums due or currently required to be paid under the terms of any mortgage or note insured or held by the Federal Housing Commissioner; (ii) All amounts required to be deposited in the Reserve Fund for Replacement; (iii) All obligations of the Project other than the insured mortgage unless funds for payment are set aside or deferment of payment has been approved by the Commissioner; and (2) the segregation of: (i) An amount equal to the aggregate of all special funds required to be maintained by the project; (ii) All tenant security deposits held . . . ." F.H.A. Regulatory Agreement, paragraph 12(g).

Essential to the Government's argument is the proposition that once the $125,000.00 of new funds was deposited in the Sutton Place Management Corporation account, such money became Project funds subject to the distribution restrictions of the Regulatory Agreement as set forth above. It is clear that at the time the $86,000.00 was paid out, an arrearage existed on the Project's mortgage payments, and thus the Government claims that the distribution of the $86,000.00 could not have come out of "surplus cash" as defined by the Regulatory Agreement. By the Government's reasoning, if such distribution was not made from surplus cash, the burden of justifying the distribution rests upon the Project owners. *See* United States v. Thompson, 272 F.Supp. 774 (E.D. Ark.1967), aff'd, 408 F.2d 1075 (8th

Cir. 1969). Finally, it is the Government's position that the Defendants are unable to justify the $86,000.00 of expenditures as "reasonable operating expenses" or "necessary repairs" and therefore it contends that the Court must find a violation of the Regulatory Agreement and necessarily must then order reimbursement of $86,000.00 to the Government.

But for the existence of the Forebearance Agreement the logic of the Government's case is impeccable. While the Government seeks to drive a wedge between the Regulatory and Forebearance Agreements, or alternatively, to minimize the legal impact of the Forebearance Agreement upon the Regulatory Agreement, the Defendants emphasize the importance of the contractual modifications worked by the Forebearance Agreement. Preliminarily, the Court is satisfied, from the testimony and from a review of the documents, that the Forebearance Agreement referred to the Regulatory Agreement [6] and that the terms of the Regulatory Agreement are fully susceptible to alteration or modification by subsequent agreement of the parties.[7]

The Forebearance Agreement of February 28, 1964 executed by the parties subsequent to the Regulatory Agreement provides inter alia:

". . . The parties hereto agree as follows A.1. On or before the tenth day of each month following November 1, 1963, . . . Grantor [defendants Gilman and Rosen] agree to pay Beneficiary [Metropolitan Life

---

6. The Forebearance Agreement and its subsequent Extension, signed by Defendants Rosen and Gilman; the Mortgagee, Metropolitan Life Insurance Company; and the Federal Housing Commissioner, refer directly to the Deed of Trust which, in turn, incorporates the entire Regulatory Agreement. The Court can find no statutory or other authority which would preclude a voluntary agreement modifying the terms of a Regulatory Agreement. See, e. g., 12 U.S.C. § 1715k.

7. Although the locus of the execution of both the Forebearance Agreement and its subsequent Extension appears to have been the State of New York, given the fact that the subject matter of the contract is real property in the State of Maryland, in addition to the fact that the Note and Deed of Trust and Regulatory Agreement were made in Maryland, the Court is of the opinion that the law of the State of Maryland should apply in this matter. See Bish v. Bish, 181 Md. 621, 31 A.2d 348 (1943); Restatement (Second) of Conflicts § 59 (1971).

Insurance Company] the net income for the previous month, as shown by the monthly accounting of receipts and disbursements: All sums received shall be applied to tax, hazard insurances and FHA mortgage insurance premium accrual accounts, and then to amounts due under the Note and Deed of Trust in the order provided for therein . . . 2. As used herein, net income shall include all cash receipts from the mortgaged property in excess of necessary and reasonable disbursements satisfactory to Beneficiary for operating and fixed expenses . . ." Forebearance Agreement, par. A. (Feb. 28, 1964).

The Forebearance Agreement continues by stating that if the payments, as set forth above, are made in accordance with the terms of the Agreement, the mortgagee will forebear from taking any action with respect to default under the Forebearance Agreement or the Note and Deed of Trust.

Since the validity of both the Regulatory and Forebearance Agreements is beyond dispute, the Court must determine whether any terms of the earlier Regulatory Agreement are inconsistent with the later Forebearance Agreement and if so, whether the former is superseded. On the first question, the Forebearance Agreement clearly speaks to the matter of Defendants' obligation on the Note and the Deed of Trust. It effects an adjustment of the prior obligations of the Defendants under the Note and Deed of Trust. In stipulating that only cash receipts from the mortgaged property in excess of necessary and reasonable disbursements need be paid to Metropolitan Life Insurance Company during the life of the forebearance period, the Forebearance Agreement necessarily touches upon the issue of what need not be paid to the Mortgagee and hence, what constitutes unrestricted Project funds. Although, as noted by the Government, the ripple effect of this adjustment tends to relax the controls on the disbursement of Project funds at a time when the Proj-

ect was experiencing financial difficulty, the "net income" provision in the Forebearance Agreement collides with the clear meaning of paragraph 12(g)(1)(i) of the Regulatory Agreement. That paragraph which narrows the definition of "surplus cash" to cash remaining *after* payment of sums due on the Note and Deed of Trust, simply cannot be squared with the "net income" requirement in the Forebearance Agreement.

■■■ It is a well established principle of contract law that where two written contracts differ in terms or conditions regarding the same subject matter, the terms or conditions of the later contract supersede those of the earlier contract. See, e. g., United States v. Lange, 35 F.Supp. 17 (D.Md.1940), aff'd, 120 F.2d 886 (4th Cir. 1941); Chew v. DeVries, 240 Md. 216, 213 A.2d 742 (1965); William Danzer & Co. v. Western Maryland Railroad Company, 164 Md. 448, 165 A. 463 (1933). Applying this principle, it is necessary to view the definition of "surplus cash" contained in paragraph 12 of the Regulatory Agreement as modified, as a result of the substitution of the "net income" provision in the Forebearance Agreement, for the "payment of sums due on the Note and Deed of Trust" provision in the Regulatory Agreement. Reading the Regulatory Agreement in light of the above modification, it is evident that during the forebearance period "surplus cash" as defined in paragraph 12 of the Regulatory Agreement means the cash remaining after payment to the Mortgagee of all cash receipts from the mortgaged property plus the other definitional provision of paragraph 12(g) of the Regulatory Agreement which stands unchanged by the Forebearance Agreement. It is clear that the $125,000.00 credited to Sutton Place Management Corporation's account was not "cash receipts from the mortgaged property." Also, there is no showing that the $125,000.00 had to be applied toward the payment of any of the other obligations enumerated in paragraph 12(g). Consequently, this $125,000.00 constituted sur-

plus cash within the meaning of the Regulatory Agreement, and thus was exempted from the restrictions of paragraph 6 of the Regulatory Agreement. The addition of the $125,000.00 of surplus cash to the account of Sutton Place Management Corporation on July 20, 1965, permitted the Defendants properly to issue checks in the sum of $30,000.00 to Sterling Capital Corporation on July 20, 1965 and $10,000.00 to Altman Brothers on July 20, 1965.

■ The Defendants also issued two checks of $15,000.00 each, respectively dated October 25 and November 12, 1965, payable to Sterling Capital Corporation and a total of four checks payable to Defendants Rosen and Gozan, of $4,000.00 apiece bearing the dates of April 11 and April 15, 1966. It is agreed that these checks were issued after the extended Forebearance Agreement period expired on October 1, 1965. However, the Defendants contend that by virtue of an understanding with the FHA the Defendants could lend money to the Project with the expectation that such loans could be freely withdrawn even after the Forebearance period expired. In other words, this understanding was a modification and extension of the Forebearance Agreement. However, aside from what Defendant Gilman characterized as a "conveyance of an impression" or the "whole tenor" of his discussions with the FHA officials, the Court is unable to find any evidence that a concrete bargain, oral or written, was struck between the parties. *See, e. g.,* CIA. Naviera Somelga S. A. v. M. Golodetz & Co., 189 F.Supp. 90 (D.Md. 1960); L & L Corp. v. Ammendale Normal Institute, 248 Md. 380, 236 A.2d 734 (1968); Robinson v. Gardiner, 196 Md. 213, 76 A.2d 354 (1950). Nor does the evidence adequately support the Defendants' argument that as a result of an "understanding" which Mr. Gozan purports to have achieved with the FHA, the Government must be estopped from

recovering the amount of the checks paid to Sterling Capital Corporation and to the Defendants. *See* First National Bank v. Mayor and City Council of Baltimore, 27 F.Supp. 444 (D.Md.1939) aff'd, 108 F.2d 600 (1940); Renotas v. Storm, 163 Md. 27, 161 A. 248 (1932).

Defendants further contend that the total of $46,000.00 distributed from the Project's account after October, 1965 was expended to "pay obligations of the Project" and that such is in accordance with the terms of the Regulatory Agreement. Defendants' contention rests upon their reading of paragraph 12(g)(1)(iii) of the Regulatory Agreement which apparently permits Project owners to pay off all Project debts other than the insured mortgage, before determining whether there exists any surplus cash. As understood by Defendants, this provision collides with paragraph 6(b), also of the Regulatory Agreement, which prohibits the disposition of rents or funds of the project other than for reasonable operating expenses and repairs, except for surplus cash. According to Defendants, a combination of the two provisions prohibits project owners from paying obligations of the Project unless surplus cash is available. This result, as Defendants would have it, emerges from an irreconcilable conflict of the two Regulatory Agreement provisions and it is thereby incumbent upon the Court to construe these provisions strictly against the Government, the author of the Regulatory Agreement.

■ The Court is in full accord with Defendants' interpretation of the two provisions, to the extent that absent surplus cash, obligations of the Project must remain unpaid. However, despite some logical circuity, the Court is unable to find any irreconcilable conflict between the two provisions. At the same time, the Court finds that the combination of the provisions does not render an absurd or impossible result such as to require construction.[8] *See generally*

---

8. The Court is well aware that the combination of provisions appears to lock Project owners into a difficult position. No Project funds can be paid out except

Mattingly Lumber Co. v. Equitable Building & Savings Association, 176 Md. 403, 5 A.2d 458 (1939); J. A. LaPorte Corp. v. Mayor and City Council of Baltimore, 13 F.Supp. 795 (D.Md.1936).

The Government contends that this Court lacks jurisdiction to grant relief against the Government on the recoupment claims of the Defendants. However, a recoupment counterclaim, as distinguished from a set-off, can be used defensively against the Government where such counterclaim arises from the same transaction as the Government's claim. See United States v. Shaw, 309 U.S. 495, 60 S.Ct. 659, 84 L. Ed. 888 (1940); Federal Savings & Loan Insurance Corp. v. Quinn, 419 F.2d 1014 (7th Cir. 1969); Frederick v. United States, 386 F.2d 481 (5th Cir. 1967); In re Monogahela Rye Liquors, Inc., 141 F.2d 864 (3d Cir. 1944). Cf. United States v. Kittredge, 445 F.2d 1117 (5th Cir. 1971). Since both the Government's claim and Defendants' counterclaim arise from payments made in connection with the Project, the Court finds the requisite identity of transaction to permit Defendants' recoupment counterclaim.

The Government further seeks to preclude any recoupment by the Defendants on the theory that once the Project went into receivership Defendants' expenditures on behalf of the Project become reimbursable, if at all, as unsecured general creditors' claims and fully subordinate to the secured mortgage claim of the Government. In support of this proposition, the Government cites the case of United States v. Pine Hill Apartments, Inc., 261 F.2d 667 (5th Cir. 1958). There, it was held that because substantially all of the funds in the hands of the receiver were derived from the rents paid subsequent to the default of the Project, the Court could not properly direct payment to unsecured creditors of funds upon which the Government had a lien, absent a showing of special circumstances. However, this Court does not read Pine Hill to mean that the provisions of the Regulatory Agreement allowing payment out of the Project funds for reasonable operating expenses and necessary repairs become inoperative at the appointment of a receiver. Consequently, any expenditures of Project funds to pay reasonable operating expenses and necessary repairs, even after the appointment of a receiver, are not subject to the principle of lien priorities.

The evidence clearly shows that Defendants personally assumed responsibility for a number of debts incurred by the Project. This assumption of responsibility is in accordance with the Defendants' obligations under the Regulatory Agreement. See Regulatory Agreement, ¶¶ 7, 9 and 14. Any personal payments made by the Defendants, consistent with the terms of the Regulatory Agreement, must therefore be governed by the equitable principles of quasi contract. See Baltimore & Ohio Railroad Co. v. United States, 261 U.S. 592, 43 S. Ct. 425, 67 L.Ed. 816 (1923); Ross Engineering Co. v. Pace, 153 F.2d 35 (4th Cir. 1946). See generally 1 Corbin on Contracts § 19.

from "surplus cash" and "surplus cash" cannot be had until after all obligations of the Project are paid off. Thus, to acquire "surplus cash", it is necessary to pay off Project obligations from non-surplus cash Project funds in violation of the Regulatory Agreement. If the Regulatory Agreement provides no escape from this seemingly circular logic, the conflict of the provisions would, as Defendants contend, impel judicial construction of the Agreement. However, the Agreement itself provides an exit from such apparent circularity by stipulating

that Project owners can obtain written permission from the Commissioner to expend "non-surplus cash" funds to pay off Project obligations. This is truly a narrow crack, and perhaps one through which the Defendants never realized they would have to squeeze. On the other hand, in the absence of evidence as to a mistake, misunderstanding, etc., the Court must assume that the parties fully understood the terms of this Agreement, which as noted above, needs no judicial construction.

■ The Court finds that the following out-of-pocket expenditures by Defendants were either reasonable operating expenses or necessary repairs for which the Defendants are entitled to recoupment.

(A) $95.00 in legal fees for investigation of a claim of National Floors & Ceiling, Inc.

(B) $5,557.57 paid in settlement of salary claims of a former employee, John Smith.

(C) $699.50 paid in connection with the claim of Frederick Miller for decorating and design services for the Project.

(D) $182.00 paid for legal services in connection with pending litigation against the Project.

(E) $1,632.99 paid to Lawrence Eck for electrical work for the Project.

(F) $653.94 paid to Hess Oil for oil in April, 1966.

(G) $2,556.00 paid to Baltimore Gas & Electric Company for utilities services to the Project.

(H) $1,980.80 paid to Bailey, Martin & Fey, Inc., for insurance on the Project from July 15, 1965 to April 22, 1966.

(I) $3,225.34 paid in connection with the suit of Edward M. Hanrahan, Jr.

(J) The Defendants also seek recoupment of $31,160.50 which was paid to General Electric Credit Corporation for restaurant equipment, used by Winston's Steak Pub, Inc., a tenant of the Project. The Government contends that recoupment should not be had because the receiver had no legal obligation to pay this sum which was the balance due on a conditional sales contract to which neither the Government nor the mortgagee was a party. However, the evidence in the case is that this payment not only inured to the benefit of the Government, but that the Government did not object to the Defendants' action. Since testimony revealed that leasing of Project property to commercial enterprises, such as a restaurant, is within the normal function of the Project, the Court finds that the $21,160.50 personally expended by Defendants was a reasonable operating expense which may be recouped in this action. In addition, $450.00 paid by Defendants to Daniel M. Geller, as a real estate commission for obtaining Winston's Steak Pub, Inc., as a tenant was a reasonable operating expense which may be recouped.

■ Defendants also seek to recoup $22,500.00 from the Government, representing a $1,500.00 per month management fee to which the Defendants feel they are entitled as a result of Defendant Gozan's service as the Project's Manager from January, 1965 to April 22, 1966. However, as this Court has found Mr. Gozan, upon assuming the Project Manager's position, specifically waived his $1,500.00 per month Manager's salary and the evidence indicates that that waiver was never revoked. Although Mr. Gozan may have been, as he asserts, entitled to the Manager's fee, his waiver of that benefit is conclusive of his present right to recoup. Thus, the Court will disallow this claim of recoupment in the amount of $22,500.00.

For the reasons stated above, it is this 26th day of June, 1973, by the United States District Court for the District of Maryland, ordered:

(1) That damages of $46,000.00 are awarded to the Plaintiff from the Defendants Rosen and Gozan, jointly and severally;

(2) That Defendants Rosen and Gozan, jointly and severally, are awarded recoupment against the Plaintiff in the sum of $38,193.-64; and

(3) That the court costs be divided equally between the Plaintiff and the Defendants Rosen and Gozan.